The case of the morning, Dennis Mazzetti v. Kara Wood et al. Thank you, Your Honors. I'm Kenneth Frazzolini. I'm attorney for the appellant, Dennis Mazzetti. May it please the Court, I respectfully request that four minutes reserve for rebuttal time in a letter. That's great. If you'd pull the microphone a little bit closer. Thank you, Your Honor. The matter comes before the Court on an appeal of a dismissal of a civil rights case filed by Dennis Mazzetti against case workers that work for the Division of Youth and Family Services of the State of New Jersey, now the Division of Child Protection and Permanency. The dismissal was based on an application of the Rooker-Feldman Doctrine that is respectfully submitted. It was an erroneous application of the doctrine, as the pleadings in this case were well pled and were not something that should be dismissed on a Rule 12b-1 or a Rule 12b-6 motion. The allegations as stated in the complaint certainly went past the standard of possible to plausible and even probable. That wasn't the problem. It wasn't a Twombly or an Iqbal issue. It was a question of whether you were seeking to undo the State Court judgment. Isn't that correct? Yes, Your Honor. Well, the decision ultimately by Judge Hayden was that the Rooker-Feldman Doctrine applies, but she misapplied the standard by misapplying... How so? How did your complaint not suffer from Rooker-Feldman? Well, on its face, it does not direct a remedy at the judgment itself. The judgment of termination of parental rights that was obtained by the division against Mr. Mazzetti is not something that was before the District Court. Well, you know, I look at your complaint. Paragraph 68, for instance, in terminating Dennis Mazzetti's parental rights, D-Y-F-S, Martin, Severino, and Lucas have committed fraud upon and or perjury. 69, in terminating parental rights, lying about the time she terminating parental rights, committed fraud, and terminating parental rights, acted in contempt of court. Isn't that basically a direct attack on the decision of the State Court terminating parental rights? And isn't that what Rooker-Feldman's all about? Well, Rooker-Feldman only addresses a situation in which the remedy that is sought is a reversal of the judgment. One of the factors that was... Well, you very carefully say over and over again you're not attacking the judgment. Yes, Your Honor. But aren't you, in effect, doing so? But aren't you, in effect, doing that? Now, whatever other independent allegations you might have, you must agree that those that perhaps Judge Roth just articulated are attacking the judgment. Well, the Supreme Court has been consistent, the Third Circuit has been consistent that as part of an allegation or complaint in a civil rights case in which a judgment was entered against you, the process in which that judgment was procured is subject to attack by way of a civil rights complaint. We're talking about Rooker-Feldman. We're not talking about general civil rights pleading. Let me back you up a moment to see what this case is really about. Has the adoption been finalized yet? Yes, it has. It has been finalized? Yes. So it was not when Judge Hayden inquired of this a year ago, almost a year ago, the argument. And you had told her at that point that you're going to go in and into court, into state court, and pursue your rights to make a motion to vacate the judgment and try to get your rights restored. Did you ever do that? I did file a judgment, a motion to vacate judgment, Your Honor. And what happened? It was denied by the presiding judge on the basis that the court believed that the New Jersey Supreme Court had indicated in a decision that simply being born with traces of cocaine as a child was not the basis for the termination of that judgment. The motion here, the one before us, is not about – you're not seeking to get your son back. No, that's correct. Which is why you say you're not attacking the judgment. Correct. This action is only about money, a lot of it. Yes. And you want a judgment against the state of New Jersey telling them what – an injunction – telling them what they have to do in your judgment to not violate people's due process rights to do everything unconstitutionally. That's what you want. Precisely, Your Honor. But you're not looking to get your son back. Yes, Your Honor. In this particular case, what happened at the beginning were ministerial acts, that the prosecutor, the attorney general's office on behalf of the IPAS investigated my client's paternity, which they have no standing to do, and lied to the court and said that well, we don't know who's on the birth certificate. My client was the father of the child. Well, maybe because the identical twin brother was – the child was named after him. That didn't help. Maybe because there's a legal presumption that the legal husband is the father of the child. But that only applies if there's a challenge to the paternity by the parents. But it's a legal presumption at the beginning that you start out with. Yes. And you can work beyond that. But that presumption was overcome immediately because the mother – all three potential parents, as the diaphus represented, all agreed that Dennis Mazzetti was the father. So there was never an issue. Even though they named the child Daniel. Exactly. After the husband. Well, as a nephew. I mean, after – I mean, as the – When you have identical twins, is the DNA the same? That's what was represented apparently by the experts, that identical twins, that the technology is not in place right now to differentiate between identical twins. So there was no possible way other than the representations of the parents as to who the parents were. This could be a moot court problem. Yes, Your Honor. It certainly was. Let me take you back to where I may have interrupted Judge Roth earlier, and I apologize if I did, back to Rooker-Feldman. Yes. It is fair to say, is it not, that neither side helped Judge Hayden out much when it came to citing the appropriate relevant cases. I don't know that anyone to the extent I could see cited Exxon Mobil, cited Great Western. I think Great Western was cited once. Once, but without – A lot of NPOs were cited. A lot of NPO cases were cited. And Exxon Mobil, I mean, they say – we say they clarified Rooker-Feldman. Well, I did, in my judgment, a lot more than clarify. It emphasized – I nobody really helped her. Well, Your Honor, I would say that the case that I cited, the Ernst case, is still the law. That was years before Exxon Mobil. But Exxon – Or the year of Ernst. It goes back, way back. But Exxon Mobil, as Your Honor just stated, actually indicated it's more restrictive than some of the district courts are applying it. So there was nothing in the Exxon case that said, well, Ernst is incorrect. We need to expand the doctrine and dismiss more cases. They said, well, Ernst is correct. And other district courts are out there dismissing cases. Stop it. You're not following the directives of the Third Circuit. You're not following the directives of Exxon Mobil. But Exxon couldn't have been clearer to say the only cases in which we have applied Rooker-Feldman are Rooker and Feldman. I mean, really saying that it's such a limited principle here. Instead, Judge Hayden was talking about this inextricably intertwined aspect, which I think we even cautioned in Great Western we can't – we shouldn't go there, in effect. Yes, Your Honor. I agree. That the – how Judge Hayden said, well, you could put the same facts on top of our complaint and somehow that's a challenge against the state judgment. The courts have ruled that you could even bring – even if you lose a state court action, you could bring the action in federal court and technically that's not a – that's not being dismissed under Rooker-Feldman doctrine. There are other doctrines. There could be preclusion. Right. There could be appropriate extension. But preclusion is not jurisdictional. That's correct, Your Honor. And Rooker-Feldman is. Yes. And that's why there was no basis that was respectfully submitted – dismissed the case on jurisdictional ground. The court had jurisdiction in this case. How do you distinguish Reed and the other non-presidential opinions that we have – do you distinguish them or do you just say got it wrong? Well, I distinguish because the case – this Court judge and Reed got it wrong. But the case – the cases that he cited for the Third Circuit were cases where mostly pro, say, litigants who don't have enough familiarity. He also cited Exxon Mobil. He cited Exxon Mobil, but – He did not cite Great Western and you don't cite either case in your briefs to us. Yes. I believe the attorneys for the Attorney General, I believe, did cite Great Western. What? Yes. But I really believe that the – that was because the Ernst decision was the one that was on point. And I really had gone into the oral argument in the district court understanding that Ernst is still the law of the land. When it comes to DIFAS, Child Protective Services cases, you could even go so far as to argue that there was fraud in the obtaining of the judgment that there was a conspiracy. And the way that Hayden distinguished – that Judge Hayden distinguished it was that somehow there wasn't as much maliciousness in this case as that case because the child wasn't ultimately on the way to being adopted by the paternal grandmother. But that's not the issue that's being decided in Rooker-Feldman. It's strictly a jurisdictional issue. Your complaint is a little bit vague in respect to what could escape a Rooker-Feldman bar. What claims specifically do you invoke that would – that are – that can be said are independent of the state court judgment? Well, I think the two most important ones are what happened initially, that the taking of the child without any basis before the court proceeding, that Mr. Mazzetti was never provided a fact-finding hearing. Taking the child with no basis. Yes. The mother and the child had tested positive for cocaine. But not the – but everybody acknowledged that the father had nothing to do with that, so that there was nothing – Well, who was the father? Who knew what the father was at that point? Well, everybody acknowledged that immediately, except for the state, which didn't have standing to challenge that. I know – So it's the basically due process? Well, substantive due process at the beginning, but then also retaliation towards the end when Mr. Mazzetti started fighting for his civil rights, raising issues, raising free speech, using his free speech. He was retaliated against, so a due process. I want to appeal my case, and there we have the division saying, well, if you appeal your case, we're not going to let you see your child. We know that if you let the adoption go through and drop your appeal, then you could see your child as much as you want. We have no real basis to stop you from seeing a real concern, but we're going to retaliate against you. We're going to not let you see your child even if he's sick at a hospital, which they did do. So there's free speech issues, and I'll reserve whatever is left. Thank you, Your Honor. All right. Thank you. Thank you. Good morning. Peter Wendt, on behalf of Carol Wood, Alison Blake, Kathleen Lucas, Anna Severino, Mary Wexel Martin, Susan Slafe, and the New Jersey Division of Child Protection and Permanency. May it please the Court. In this case, the appellant saw appellate review of various New Jersey state court decisions in the United States District Court. Specifically, the appellant filed a complaint in the United States District Court challenging the decisions of a New Jersey trial court which had a five-day trial. The New Jersey Appellate Division, which reviewed the New Jersey trial court, and the New Jersey Supreme Court. Didn't the appellant make it abundantly clear to the District Court that he was seeking money damages and an injunction so that this wouldn't happen to anyone else in terms of the way your clients conducted themselves? Did it have to do with their actions? And didn't he make it entirely clear that he was not seeking to overturn the state court judgment? The appellant did make clear to the U.S. District Court that he was seeking monetary damages and injunctive relief versus overturning the termination. It's our position in our brief where we went through the Great Western. We did cite Great Western, and we did go through the Great Western analysis. You cited the factors, but you didn't discuss them. And particularly, I think our argument is centered on factor four. On the rejection factor you're on? Yeah, the four factors that have to be considered. Yes, I agree. And the two are in dispute. Why don't you just tell us now why factor four helps you? Well, factor four that the plaintiff is inviting the district court to review and reject the state judgments. First of all, in the earlier question that Judge Randell raised with regard to prior case law, even though it was an unpublished case, there's been prior case law which Judge Hayden relied on in which they talked about the fact that what you're doing here by bringing your due process case, by a finding of due process violation, it would in effect be rejecting the state court's determination. The state court made the determination that the parental rights should be terminated by allowing the case to proceed in federal court. But his damages have to emanate from the judgment itself, not from independent conduct, conduct independent of the judgment. How does the claim that pre-termination he was not allowed to visit his son in the hospital, how is that not independent of the judgment, the state judgment itself? Because all the claims that are being raised in the federal action, it's our position that they all stem from the termination of parental rights injury. That's not the test, though. I mean, obviously, he wouldn't have sued unless there was an adverse result. But what he's complaining about is what was done. And isn't that classic Great Western? I mean, when the source of the injury is the defendant's actions and not the state court judgment, the federal suit is independent, even if it asks the federal court to deny a legal conclusion reached by the state court. Isn't that classically what we have here? Well, we would say, Your Honor, that it does fall within the prong of the plaintiff complaint, that it's distinguishable from Great Western, this particular case, that it does fall within the prong of the plaintiff complaints of injuries caused by state court judgments. Because when you look, as Judge Hayden did, even though I agree she didn't use the Great Western for a prong test. And neither did the Reed case that she relied on. They didn't even cite it. And you cite it to us, but you don't explain it. Nobody cited it to us. Well, the only reason I raised the Reed case, Your Honor, is it was raised earlier in the context of the Great Western faction. She was, indeed, impressed with the Reed case. It was Judge Hillman. And he had cited Exxon Mobil, but he didn't really go into an explanation. And his reasoning makes sense, except he didn't explain how Exxon has changed law escape and how Great Western has factors which must be dealt with. But you could take his point about rejecting the state court judgment, even though he didn't cite Great Western. You can take that analysis and use it for the fourth prong of the Great Western test. You can also, it's also our position that when you look at the totality of the case, even though Judge Hayden was not analyzing the Great Western test, it's our position you could take her rationale and the findings that she made and have it satisfy the Great Western test. Because what she pointed out in her ruling was the fact how similar the cases were. She, how, between the action that was brought in the state court and the allegations of the federal court. And if you look at the appellate division, state appellate division decision, that becomes clear. Because the issues regarding appellant's employment, housing, drug testing, they were all considered by the New Jersey appellate. They were all actually litigated, right? Yes. But that's preclusion doctrine. That's different. That's not Rooker-Feldman, which is jurisdictional. But as part of that, she also went on to... You could maybe win that argument if the case goes back, that these issues were in fact actually litigated, some of them. I don't know. Maybe you will, maybe you won't. If it goes back, I don't know what will happen. But that's different from applying Rooker-Feldman... I agree. ...as clarified by Exxon and Great Western. No, I agree that the preclusion doctrines aren't subject matter jurisdiction doctrines. But I would still say, as part of the overall analysis, taking those things into effect, and also the fact that Judge Hayden pointed out that the appellant had the opportunity in the state court case to raise these various civil rights claims that he's raising here. She pointed that out in her opinion. She pointed to... And is that part of the test? Part of the Great Western test? Yeah. That you maybe could have done it earlier? Well, I think, Your Honor, it comes back to the point that all these together come back to what is the injury, to the second factor that you're talking about. But you're saying, then, if you lose in court, and as part of the proceedings, your constitutional rights were violated, you are totally foreclosed from going into court and trying to redress and trying to have an injunction against those types of proceedings and procedures going forward or remedying them with damages just because you have lost in state court, you totally lose your right? No, Your Honor. What I'm saying is, Judge, as part of her analysis in this case, a factor is, Judge Hayden said, these civil rights claims were raised, were brought forward, or had the opportunity to be brought forward. So they were part of the case already. So what you're doing by going back to the U.S. District Court... Maybe that's a res judicata. Maybe that, you know, if the case proceeds, and, you know, it's not thrown out, but it proceeds, and you're found to be barred because you waived them or they've been litigated, that's another issue. But Rooker-Feldman is different. I agree it's a different doctrine. But we would still say when you take all of these factors together, what happened at the trial court, the history of the case, it still would fall within the four-prong Great Western case. Well, then tell me how the question you didn't answer before, because we've been asking a lot of questions, how would a pre-termination refusal to let the father see the son in the hospital is involved at all with the state court judgment? Well, this whole process from the time that the child was born until the termination proceedings could have all been brought forward, and all these arguments made as part of the termination case. But that's not Rooker-Feldman. No, Rooker-Feldman would be, though, when you look at the state court proceeding, whether or not, and the federal action, whether it's that... The judgment. Excuse me, I'm sorry. The judgment, not proceedings. The judgment. When you look at the state court judgment, whether or not the four-factor Great Western test is satisfied. Counsel, your time's up. Is Ms. Warrenberger also arguing before us? Yes. All right. Thank you. Thank you. Good morning, Your Honors. Judith Warrenberger on behalf of Alice Schaefer Nadelman. May it please the Court. If I may switch gears to the issue of absolute immunity, which is also before this Court. Dr. Nadelman, my client, is the licensed psychologist who, at the request of DIFAS, then the division today, prepared a report that was utilized by the Court in determining that the parental rights in this matter should be terminated. I would submit in this context she acted as an arm of the Court, and under the case law of... Now, you're defending Judge Hayden's ruling in this regard, correct? Yes, I am. Okay. She also found all the defendants were barred by Rooker-Feldman. Pardon me? She also found all of the defendants were barred by Rooker-Feldman. This is like an alternative argument, is it not? This is an alternative argument. Since it hasn't been raised at this point, I'd like the opportunity to discuss that with Your Honors. I understand the Rooker-Feldman issue and the pros and cons of what Judge Hayden did. I haven't heard Mr. Rossellini discussing... Go ahead. Okay. I don't know that he's waiving that argument. You may address it on rebuttal. Okay. At any rate, the cases that I would point Your Honors to in regard to this case, in that case this court determined that the social worker, case worker, members of the whatever court system it was, it was a Pennsylvania version of the Child Protective Agency, was found to have absolute immunity based on the fact that they were Well, it was in connection with the dependency proceedings. Correct. So it's not something that's separate and apart and just merely administrative or investigative. It was a core function, correct, of the proceedings? Correct. As was, I would submit, the function of Dr. Nittleman in this regard. She prepared a report that was utilized by the court. She testified in the five-day trial that we've heard about. She was cross-examined. And I would submit that not only under Ernst, but under the Briscoe versus LaHue case, our Supreme Court has made very clear that there should be protection to witnesses that come forward, both official witnesses, governmental witnesses, and private witnesses that testify. They're deemed to be an integral part of the judicial process. And I would submit that Dr. Nittleman swore to tell the truth. She was cross-examined. Presumably her testimony was considered and utilized by the court in reaching its conclusion in that the parental rights were terminated and that that finding of the trial court, based at least in part on her recommendation, was affirmed by the Appellate Division and the New Jersey Supreme Court and the U.S. Supreme Court both rejected petitions for certiorari and or certification. The goal of that rule, I would submit, is to assure that people involved in judicial proceedings should be given every encouragement to make full disclosure of all the pertinent information within their knowledge without fear of harassment, intimidation, or litigation. And that's language from Briscoe. And for that reason, on behalf of Dr. Nittleman, I would request the court to affirm the district court dismissal as to Dr. Nittleman based on her function in this case as the expert on behalf of Dyfus. All right. Thank you. Thank you. Mr. Russel? Thank you. Thank you. As I address the court in rebuttal, I think it's important to understand that, again, Mr. Mazzetti's argument that it's a matter of substantive due process and how it applies to Rooker-Fellman. There was a case in 2009 that Pondexter v. Allegheny County, 329 F.X. 347, which acknowledged, again, the doctrine that Rooker-Fellman may not apply when the complaint is based on how the judgment was procured. Now, I'm arguing we are not waiving the unity issue. As far as Dr. Nittleman, we're submitting first that she was not in the capacity as an impartial court-appointed expert. She was acting as a contracted party for the divisions. And some of the things that ended up in her report weren't things that had anything to do with an impartial decision-making as to a psychological report for a parent. She was disparaging Mr. Mazzetti's thing. Well, he's complaining about what the division is doing to him. There's something psychologically wrong with him for doing that. She's misrepresenting the amount of time that she's spending with him. She's putting things in a report based on the instructions of the division. Now, that's what the allegations are in the complaint, in the well-pled complaint. And for purposes of this motion, they were to be accepted as true. And the process, as your honors have indicated, is that the complaint does ask for injunctive relief to change the system of DIFAS and how now the Division of Child Protection and Permanency pursues their cases. Mr. Mazzetti did not have an opportunity for any kind of meaningful fact-finding hearing other than a very minor probable cause hearing for more than two and a half years. While that was happening, the division forced him to move out of the house, the same house where he would have been able to have his child with the mother. He's now in a situation where he literally lives across the street so he could be with his child. And pretty much what happened here was that it was the actions of the division really that caused the harm to the child and caused the harm to this family for two and a half years where they had to go through everything and then for additional time after that. And the rep. Can I press a prosecutorial immunity claim against the Deputy Attorney? I mean, I didn't hear you argue it before. I don't see her before us today. Also, as to the Attorney General, it's the conspiracy of the ministerial acts. The extent that she acted as an investigator, the one case where prosecutors advising police officials has had to conduct an investigation. She prosecuted this. But she also investigated it. That's what a prosecutor does in connection with a case. But actually went in and made her admission. As part of the initial taking of the child, it was due to the misrepresentations about what was on the birth certificate and also literally the allegation that she ripped up the public defender's client from having a proper hearing and the minimal due process he had on a probable cause hearing. And certainly that's not something that's presented protected by immunity. If a prosecutor tells a defendant don't show up to court, that's the type of extrinsic fraud on the court that's not protected by immunity based on a code of ethics rules. And I think the most important thing here is that this is a court of limited jurisdiction. My client and I were mindful of abstention doctrine issues here. Can he bring a civil rights claim in the Dyfus case in family court? The rules do not allow for it. So Mr. Mazzetti, he would have brought a counterclaim and pursued it at the time if the doctrines or if the state courts provide it. There is no state remedy in the state of New Jersey for a defendant, a parental defendant in a child protection services case to pursue their civil rights. And that's my time. All right, thank you. Thank you, Counsel. The case is well argued. We'll take it under advisement.